CITY OF NEW BRITAIN *v.* HOWARD L. HANCOCK

SUPERIOR COURT     HARTFORD COUNTY     FILE NO. 179000

Memorandum filed July 9, 1976

*Pudlin & Silver,* for the plaintiff.

*Januszewski, McQuillan & DeNigris,* for the defendant.

RUBINOW, J. On October 22, 1970, the defendant conveyed to the plaintiff approximately twenty-three acres of land in Newington. As consideration for the conveyance, the defendant received a check in the agreed amount of $140,000. The check was signed by both the finance director and the treasurer of the plaintiff city, and the adjustment sheet was signed by the corporation counsel.[1] The transfer culminated negotiations with the defendant that had begun in 1969; during the intervening time the purchase of the land had been the subject of study and consideration by the mayor, the director of the economic development commission, and the director of public works, all of whom concurred in the decision that the plaintiff should acquire the land. On January 29, 1971, the defendant executed and delivered to the plaintiff another deed to the same land "to correct the description as set forth in [the prior] deed." The correcting deed contained the following recitation: "Said above described premises are more particularly shown on a map entitled 'Map Showing Property of City of New Britain on Kelsey Street, Newington, Connecticut, January 1971 Scale 1″ = 60′ filed in the Newington Town Clerk's office in Vol.    Pg.    .'"

On November 23, 1970, an application for a variation of a zoning ordinance requirement affecting the subject land was filed with the Newington zoning commission. The application listed the "Applicant" as "Mr. Barry Squillacote, Director of Public Works," and listed the "Owner" as "City of New Britain, Connecticut." The application requested

---

[1] All references to city officials by title are references to persons holding office at the relevant times.

a special exception to allow the city to use "their land located on the North side of Kelsey Street abutting the Newington – New Britain town line for a Sanitary Landfill." The application also recited: "The attached plans indicate the location, conditions and requirements and regulations as set forth in the approval by the Connecticut State Health Department and specifically as shown on the attached plans with regard to diking, drainage, buffer strip, access and cover material."

On September 27, 1971, the Newington zoning commission conducted a hearing concerning the application for the special exception. On October 11, 1971, the commission denied the application. On November 9, 1972, by complaint dated November 8, 1972, the plaintiff commenced this action to recover the $140,000 paid for the land, and, in effect, to annul the conveyance from the defendant to the plaintiff.

In its substituted complaint, dated April 2, 1976, the plaintiff set forth two grounds that, it claims, entitle the city to the relief sought. In paragraph six (d) of the first count, the plaintiff claims that the conveyance was consummated without action by the common council and without compliance with the provisions of § 2574 of the plaintiff's charter.[2] In paragraph six of the second count, the plaintiff claims that the transaction was "ultra vires and void" (1) because the land could not be used by the plaintiff as a sanitary land site because of the "failure of the zoning authorities of the Town of Newington to approve of said use" and (2) because, since the land was "located beyond the limits of the City of New Britain," it was "unuseable by the City of New Britain for any purpose within the corporate powers of the plaintiff."

---

[2] No claims are being made under the other allegations in paragraph six of the first count.

# I

The transaction being attacked by the plaintiff is a completely executed transaction. In other words, this is not a case where a municipality claims that it is not obligated to perform a contract into which it has entered. Here, there was an oral contract for the sale of land, and that contract has been fully executed on both sides.[3] For that reason, cases cited by the plaintiff dealing with contracts executory in whole or in part are not in point.

In the case of stock corporations, the rules concerning executed ultra vires transactions do not give to either party the right to make a direct attack on the transaction. For example, a person who conveys land to a stock corporation not authorized to take or hold land may not thereafter maintain ejectment or have the deed to the grantee removed as a cloud on his title. Edward H. Warren, "Executed Ultra Vires Transactions," 23 Harv. L. Rev. 495, 506. "Conversely the corporation cannot sue . . . [the grantor] to recover back the purchase price. *Hagerstown Mfg. Co.* v. *Keedy*, 91 Md. 430. To the same effect is *Baird* v. *Bank of Washington*, 11 S. & R. (Pa.) 411, 418."[4] Id., p. 506 n.1. It is unnecessary to decide in this case, whether, if ultra vires were the only ground claimed for recovery of the purchase price, the same rule would apply to municipal corporations because the court cannot sustain the claim of the plaintiff, made in the second count, that the acquisition of the subject land

---

[3] The plaintiff does not claim that the defendant misrepresented the land, or that the city officials who negotiated the transaction and consummated it were motivated by improper motives. There was no evidence that the fair market value of the land was less than that paid for it.

[4] The stated reason for this rule is that the deed is not void but voidable, and voidable only at the suit of the state. Compare General Statutes § 33-292 (lack of power to accept conveyance of real property may be asserted only in a proceeding (a) by a nonassenting stockholder, or (b) against an officer or director, or (c) by the attorney general).

was ultra vires. Under General Statutes § 7-194 (3), all cities having a charter have the power "to take, purchase, hold . . . and convey such real and personal property as the purposes of the . . . city . . . require . . . ." Furthermore, under § 7-194 (8) the city has the power to maintain and operate "garbage and refuse disposal facilities," and under § 7-194 (14) "to provide for . . . the collection and disposal of all garbage, trash, waste and ashes, either by contract or otherwise . . . ." In *Wood* v. *Wilton*, 156 Conn. 304, 310, the court held that "[a] refuse disposal operation is generally held to be a governmental function."

When the subject land was purchased, the city had the need for an additional disposal area, which was the purpose for which the land was obtained, and the city officials who approved the purchase did not foresee the events that led to the frustration of that purpose. In short, it was within the power of the city to purchase land for the purpose for which it was purchased, and the subsequent events affected not the purpose for the purchase but the ability of the city to have that purpose become a reality.

## II

There remains for consideration the claim that, even if the purchase was not ultra vires, the purchase price may be recovered because the purchase of the land was not accomplished in the manner prescribed by § 2574 of the charter. That section sets forth the procedure to be followed whenever "it shall in the judgment of the common council become necessary or expedient for . . . [the] city to take and acquire any land . . . within the limits of said city or town of New Britain or the town of Berlin and Newington . . . ." The defendant admits that the procedure prescribed in § 2574 was not followed. The defendant claims, however, that

the applicable section is § 2564, which provides that "[t]he city of New Britain may take and acquire by purchase . . . any lands . . . within the limits of said city and the towns of New Britain, Newington and Berlin, or either or any of them, that . . . [the board of public works] may deem necessary." That section, it is to be noted, does not specify what city officials are to approve or consummate the purchase; the section merely authorizes the city of New Britain to purchase the land referred to in that section. On the other hand, § 532 of the charter specifically gives to the common council the power "to take, purchase, hold, condemn, lease, sell, and convey such real and personal property as the purposes of the city may require." In the absence of a specific charter provision giving a similar power to other specified officials of the city, the court construes the charter to vest in the common council the power to purchase the subject land and not to vest that power in any other elected or appointed officials.

When the purchase was consummated, there was a belief, shared by the mayor, the board of public works, the finance director, the treasurer, and the corporation counsel, that the purchase of land for a disposal area had been authorized by the common council as part of its capital improvement program for 1969-70. In that capital improvement program, the common council authorized the sale of bonds "to fund such appropriations as the several projects are presented for construction, execution and completion." Those projects included a "bulky waste incinerator" for $100,000, "dump land" for $100,000, and "incinerator repairs" for $80,000. That resolution was passed on March 16, 1969. On April 13, 1970, the board of finance and taxation authorized the sale of $1,915,000 of the city's notes "in anticipation of the sale of bonds" for the stated purposes,

which included an incinerator and land in the amount of $280,000. On August 28, 1970, the common council appropriated the sum of $1,915,000 "for implementation of the capital budget" and authorized the sale of bonds to meet that appropriation, "details and sale to be determined by the Mayor and the City Treasurer." Hence, at the time of the purchase of the land, both the common council and the board of finance and taxation had not only approved, in principle, the purchase of land for a disposal area, but had also taken the steps necessary to have the funds available for the purchase of land for that purpose. They had, thus, made it possible for the mayor and other city officials to negotiate for the purchase of the land in the belief that funds for that purpose had been appropriated by the common council. The resolutions of the common council and the board of finance and taxation also led the director of finance to believe that he was authorized to certify that he had funds on hand for the purpose of that purchase. In short, in purchasing the land for a disposal area, the mayor and the other city officials were doing something that was not only within the general power of the city but, even more importantly, something that the common council had implied, by its resolutions, needed to be done and had provided funds for.

It is now well settled that an irregularity in the procedure by which a transaction with a municipal corporation is consummated is not, alone, sufficient to have the transaction annulled. In determining whether the municipality will be permitted to recover the consideration paid in an irregularly consummated transaction, the courts, rather than merely inquiring into whether the procedure followed observed all formalities set forth in the charter, have looked to bench marks. For example, recovery of funds paid has been denied where there

was no evidence of bad faith on the part of the officials involved, where there was no collusion between the parties, or where there was no evidence that the price paid was unreasonable or excessive. See annot., 140 A.L.R. 583, 588. The general trend of the authorities has been summed up as follows: "Where the circumstances surrounding the execution of a public contract under which public funds have been paid out indicate that although there were irregularities in the manner of executing the agreement, its general purpose was within the powers of the municipality or other public body making it, the courts exhibit a tendency to hold that the sums paid out may not be recovered back." Ibid.

In the present case, the three cited elements that militate against recovery of the purchase price— no evidence of bad faith, no collusion between the parties, no evidence that the price paid was unreasonable—are all present. Additionally, there are present the elements of ratification and estoppel. "As to contracts which are within its power to make we can perceive no reason why a public corporation should not be bound by ratification or estoppel upon the same principles and to the same extent as are natural persons or private corporations. Accordingly a municipal corporation may be held to have ratified an unauthorized contract by retaining the benefit under circumstances which estop it from denying its liability." *Loomis* v. *Fifth School District*, 109 Conn. 700, 703–704.

Ratification in this case may be inferred from the city's acceptance of the correcting deed, from the application for the zoning exception, and from the city's appearance at the hearing on that application, where it was represented by its corporation counsel who, at that time, was not the same corporation counsel who had approved the original transfer. In addition, the city has paid the taxes on the premises

to the town of Newington from 1971 to date. Finally, on October 11, 1974, the city accepted $665 from the Metropolitan District Commission "for benefits acquired for proposed sewers on Kelsey Street, Newington, Connecticut."

On the issue of estoppel the defendant pleaded, and proved, that he had substantially changed his position in reliance upon the city's purchase, including, of course, withdrawing the property from the market and committing and disbursing portions of the proceeds of the sale.

The court finds that the conduct on the part of the city constituted ratification of the purchase, and that, in connection with the defendant's change in position, that conduct estops the plaintiff from asserting the alleged invalidity of the purchase of the land.

Judgment may enter for the defendant.